# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| PAULA JOHNSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:15CV786NCC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Paula Johnston (Plaintiff) for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. Plaintiff has filed a brief in support of the Complaint. (Doc. 12). Defendant has filed a brief in support of the Answer. (Doc. 13). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). (Doc. 9).

## I.
## PROCEDURAL HISTORY

On December 12, 2011, Plaintiff filed an application for SSI. (Tr. 160-66). Plaintiff's claim was denied, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 114-23). Following a hearing, an ALJ denied Plaintiff's application. (Tr. 14-35). On April 13, 2015, the Appeals Council denied Plaintiff's request for review. (Tr. 1-5). As such, the ALJ's decision stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. See id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). See Steed v. Astrue, 524 F.3d 872, 874

n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past.  20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work.  20 C.F.R. §§ 416.920(g), 404.1520(g).  At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC.  See Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5.  If the claimant meets these standards, the ALJ will find the claimant to be disabled.  "The ultimate burden of persuasion to prove disability, however, remains with the claimant."  Young, 221 F.3d at 1069 n.5.  See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC.").  Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence.  See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Krogmeier v. Barnhart,

294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> The concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. See Krogmeier, 294 F.3d at 1022. See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) The claimant's daily activities;

(2) The subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) Any precipitating or aggravating factors;

(4) The dosage, effectiveness, and side effects of any medication; and

(5) The claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints. See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. See id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on

substantial evidence.  See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy.  See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)).  The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.  The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).  Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used.  An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which the ALJ finds credible.  See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical.");  Rautio, 862 F.2d at 180.  Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons.  See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

**III.**
**DISCUSSION**

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled.  See Onstead, 962 F.2d at 804.  Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position.  See Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff, who was forty-four years old at the time of the hearing, testified that she graduated high school and had a year of secretarial training; that she had panic attacks on a daily basis for the two months before the hearing; that prior to having panic attacks on a daily basis, the panic attacks were not bad; that she had been having headaches every other day for the two months prior to the hearing; that symptoms associated with her headaches included vomiting, dizziness, blurred speech and vision, and burning pain; and that, when she had pseudoseizures, she would lose control of her muscles in her arms and legs, could not speak, and would violently shake and "flop[] around."  (Tr. 48-49, 54, 56-58).  In regard to the severity of her physical conditions, Plaintiff stated, in a Function Report – Adult, that her illnesses affected her ability to lift, squat, bend, stand, walk sit, kneel, talk, hear, climb stairs, and use her hands.  (Tr. 210).  Further, Plaintiff stated that she had difficulty lifting anything over five pounds; that she could walk 150 yards before having to stop and rest; and that she used a wheel chair.  (Tr. 210-11)

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 12, 2011, and that Plaintiff had the severe impairments of degenerative disc disease, osteoarthritis of the cervical spine, Cushing's disease, status post resection of pituitary microadenoma, iron-deficiency anemia, type II diabetes, fibromyalgia, pseudoseizures, conversion disorder, bipolar affective disorder (alternately diagnosed as major

depressive disorder not elsewhere classified), post-traumatic stress disorder (PTSD), generalized anxiety disorder (alternately diagnosed as panic disorder and anxiety disorder not otherwise specified), and histrionic personality disorder. The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment, and that Plaintiff had the RFC for medium work with the following additional limitations: Plaintiff could stand for 4 hours at a time, for 8 hours total in a workday; she could walk for 4 hours at a time, for 8 hours total in a workday; she could sit for 4 hours at a time, for 8 hours total in a workday; she could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; she could not climb ladders or scaffolds; she could not tolerate any exposure to unprotected heights, she could tolerate frequent exposure to moving mechanical parts and extreme cold; she could frequently operate a motor vehicle; and she was limited to understanding, remembering, and carrying out simple, repetitive tasks in a low-stress environment, defined as one requiring only occasional workplace changes and only occasional decision-making. Based on response of a VE to interrogatories and the ALJ's independent consideration of the Dictionary of Occupational Titles (DOT), the ALJ concluded that there were jobs in significant numbers in the national economy which Plaintiff could perform, and that, therefore, she was not disabled.

Plaintiff contends that the ALJ's decision is not based on substantial evidence because the ALJ failed to explain why he discounted a portion of the opinion of medical expert Anne Winkler, M.D., because the ALJ improperly considered Plaintiff's credibility, because the ALJ failed to credit information provided by Plaintiff's daughter, and because the ALJ's hypothetical to the VE was flawed. For the following reasons, the court finds that Plaintiff's arguments are

without merit and that the ALJ's determination that Plaintiff is not disabled is based on substantial evidence and is consistent with the Regulations and case law.

## A.      Plaintiff's Credibility:

The court will first consider the ALJ's credibility determination and factors relevant to the ALJ's credibility determination.  See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010).  As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ.  See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882.

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence.  Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the

analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of her credibility determination are based on substantial evidence.

First, the ALJ considered Plaintiff's work history. Indeed, Plaintiff testified at the July 2013 hearing that she attempted to work in May 2012, but she only worked for two days because of pain and exhaustion. Before that attempt to work, Plaintiff testified that she last worked in 2002, approximately eight years before her alleged disability onset date. (Tr. 49, 169, 179). A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. See Allen v. Califano, 613 F.2d 139, 147 (6th Cir. 1980). For the same reason, an ALJ may discount a claimant's credibility based upon her poor work record. See Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (ALJ may properly consider claimant had not worked for several years before filing SSI application); Ownbey v. Shalala, 5 F.3d 342, 344 (8th Cir. 1993). See also Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004) (ALJ properly found claimant not credible due in part to his sporadic work record reflecting relatively low earnings and multiple years with no reported earnings); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). Work

history is only factor among many for an ALJ to consider.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 969 (8th Cir. 2003).

Second, the ALJ considered that the objective medical evidence was inconsistent with Plaintiff's claim regarding the severity of her physical conditions.  In particular, the ALJ considered that the objective medical evidence did not support Plaintiff's allegations regarding the severity of her symptoms and functional limitations, and, therefore, found her allegations and testimony not fully credible.  (Tr. 31).  See 20 CFR § 404.1529(c)(2) (agency will consider "objective medical evidence" when evaluating symptoms); Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (ALJ may find claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary).

In particular, the ALJ considered, in regard to Plaintiff's alleged limitations related to her cervical spine, that she rarely was observed to have decreased range of motion (ROM) or tenderness of the cervical spine; that there were no objective findings of abnormal grip strength or bilateral upper extremity strength arising from Plaintiff's cervical spine; and that she consistently exhibited normal gait, station, balance, coordination, and overall had normal neurological examinations.  As for Plaintiff's Cushing disease, the ALJ noted that the record showed "very few abnormalities arising" from it since her alleged onset date.  (Tr. 31).

As for Plaintiff's pseudoseizures, the ALJ considered that Plaintiff was not observed to have weakness, impaired cognition, or impaired memory after a pseudoseizure, and she did not have bowel or bladder incontinence.  The ALJ considered that Plaintiff reported a long history of having pseudoseizures, but that video monitoring showed no epileptic activity, and that there was no medical evidence supporting her subjective report that her seizure-like spells were caused by her cervical disc disease.  The ALJ further considered that descriptions of Plaintiff's

pseudoseizures have alternately been described as "sudden weakness or loss of muscle strength, tonic-clonic, and grand-mal in nature." The ALJ also considered that few of Plaintiff's pseudoseizures were observed, and that, upon examination, immediately after a pseudoseizure, "no objective findings of post-ictal, cognitive, or other neurological abnormalities were noted." The ALJ also noted that the frequency of Plaintiff's pseudoseizures varied, in that in February 2012, she reported experiencing them twice a week, but, in June 2012 and January 2013, she denied experiencing any pseudoseizures. Additionally, the ALJ considered that Plaintiff did not specify the frequency with which she had seizures, although she testified that, the night before the hearing she had a pseudoseizure which lasted for three hours. (Tr. 27-28, 59).

Indeed, the medical evidence reflects that, in April 2009, a neurologist reported that Plaintiff presented with a "longstanding history of prolonged episodes of poor energy associated with brief episodes of being limp and generalized weakness associated with pressure in the head, photophobia, [and] phonophobia." It was also reported that Plaintiff did not pass out in her most recent episodes; that Plaintiff had been monitored for her spells; and that the monitoring "did not show any abnormality during the recorded events." (Tr. 545-546).

Emergency room records from December 23, 2010, when Plaintiff presented with "drop attacks," state that, upon physical examination, Plaintiff had *normal ROM*, and "*3/5 muscle [strength] in bilateral upper and lower extremities,*" and that Plaintiff had *normal sensory, motor*, speech, and *coordination*. No cardiovascular, respiratory, or gastrointestinal abnormalities were noted. (Tr. 415). The impression from Head Computed Tomograhy conducted on this date was that there were *no acute intracranial findings*. Plaintiff was also negative for "acute intracranial hemorrhage or focal mass effect. Ventricals [were] within

normal limits," and within the visualized paranasal sinuses no significant inflammatory changes [were] identified." (Tr. 416).

A January 4, 2011 Magnetic Resonance Imaging (MRI) of Plaintiff's brain, conducted due her history of microadenoma, showed a "subtle lesion within the left pituitary fossa" which was "not well visualized." The MRI report states that "this may [have] represent[ed] *an improvement or reduction in the size of the lesion*." There was also a "small right frontal subcortical signal abnormality," which had not changed. (Tr. 326). On January 11, 2011, when Plaintiff presented with nausea, a physical examination of Plaintiff's eyes, neck respiratory system, cardiovascular system and skin were normal. (Tr. 320). On April 8, 2011, it was reported that Plaintiff had *no difficulty when standing* from a sitting position without assistance from her arms; that she had no atrophy or edema in her extremities; that she had *normal gait*; and that her abdomen was soft and nontender. (Tr. 385-86). On June 1, 2011, when Plaintiff presented complaining of "muscle failure attacks," Plaintiff did not complain of nausea, vomiting, chest pain, or shortness of breath. (Tr. 380). On September 29, 2011, when emergency services were summoned to Plaintiff's home due to reports of her having grand-mal seizures, it was noted that Plaintiff had strong radial pulse; that she was responsive to painful stimuli; and that she had normal respirations. (Tr. 285). Review of Plaintiff's systems was negative, and, on examination, she had no focal weakness or focal sensory loss, and her appearance, eyes, neck, respiratory system, cardiovascular system, "GI/GU"system, *musculoskeletal system*, and *neurological system* were normal. (Tr. 289-90). On October 4, 2011, it was reported that Plaintiff was *negative for myalgias, joint swelling, and a gait problem*; and that she was *negative* for dizziness, tremors, and *seizures*. (Tr. 351-52). On October 13, 2011, Plaintiff was positive for back pain and muscle weakness in her extremities. On

examination, Plaintiff had a *normal gait* with "no abnormality upon inspection of the spine," and her *extremities appeared normal*, with no edema or cyanosis. (Tr. 689). On December 1, 2011, when Plaintiff presented for a cough, upon physical examination, no abnormalities were reported in regard to Plaintiff's neck, and respiratory, vascular, musculoskeletal, and neurological systems. In particular, it was reported that Plaintiff had a *normal gait* with no abnormality upon inspection of the spine. (Tr. 684). The impression from a chest x-ray performed this same date was "no acute pulmonary disease" and "old granulomatous disease." (Tr. 694).

Notably, on March 2, 2012, when Plaintiff had a "mild seizure type episode," *she did not lose control of her bowels or bladder*. (Tr. 673). Also, on this date Plaintiff was *negative for musculoskeletal symptoms*, positive for tenderness in the spine, and her extremities appeared normal with no edema or cyanosis. (Tr. 675). On February 27, 2012, pursuant to a physical examination, no abnormalities were reported in Plaintiff's back/spine, musculoskeletal system, or her extremities. Specifically, Plaintiff had *normal gait* "with *no abnormality upon inspection of the spine*." (Tr. 679) (emphasis added).

Diagnostic testing of Plaintiff's cervical spine on May 16, 2012 showed a "slight straightening of lordosis, without subluxation"; that the marrow signal was within normal limits; that "soft tissues were unremarkable"; that, at C3-C4, there was "mild facet arthropathy and a posterior disc-osteophyte complex resulting in mild bilateral foraminal narrowing and mild central canal narrowing; that C4-C5 had "only mild uncovertebral and facet arthropathy bilaterally," "with minimal/mild narrowing of the central canal and foramina"; that C5-C6 had advanced left-sided uncovertebral arthropathy, with "moderate narrowing the canal, without causing frank cord compression"; that, also at C5-C6, there was left-sided "mild/moderate" foraminal narrowing and "mild facet arthropathy bilaterally, with only minimal/mild narrowing

of the right foramen"; that C6-C7 had "a small central disc-osteophyte complex, without significant stenosis"; and that C7-T1 was "unremarkable." (Tr. 730, 822).

On June 11, 2012, when Plaintiff presented for her Cushing disease, Plaintiff denied respiratory, cardiovascular, and neurological problems, and said that "climbing stairs cause[d] [an] increase in pain in the neck and dizziness." It did "not feel that [her] legs [were] weak." In regard to Plaintiff's musculoskeletal system, upon examination, it was noted that she had "no difficulty when standing from [a] sitting position without assistance from [her] arms." Further, Plaintiff had no atrophy or edema in her extremities, and she had normal gait. Notably, Plaintiff's past medical history did not include pseudoseizures. (Tr. 815-18).

Further, August 21, 2012 diagnostic testing showed that Plaintiff had some abnormalities of the cervical spine, but that these abnormalities were mild. (Tr. 695). As considered by the ALJ, Plaintiff's doctors rarely observed that she had decreased range of motion (ROM) or tenderness. (Tr. 31). On November 27, 2012, upon physical examination, no back/spine irregularities were noted; Plaintiff's extremities were normal, with no edema or swelling; and she had a normal gait with no abnormality upon inspection of the spine. (Tr. 651).

On January 1, 2013, when Plaintiff's diabetes was assessed, she had no neuropathy with no foot ulcers. (Tr. 639). Also, on this date, Plaintiff was negative for chest pain, a gait disturbance, and for psychiatric symptoms; no spine abnormalities were observed; Plaintiff's extremities appeared normal, with no edema or cyanosis; and she had normal gait. (Tr. 639-41). The impression from a January 10, 2013 sonogram of Plaintiff's abdomen, which she had due to right upper quadrant abdominal pain, was "normal right upper quadrant sonogram." (Tr. 692).

On February 8, 2013, when Plaintiff was seen for iron deficiency anemia, Plaintiff reported having fatigue, weakness, fever, headaches, dizziness, fainting, and memory loss. (Tr.

835).  Upon physical examination, Plaintiff's lungs were clear; her extremities had no clubbing, cyanosis, or edema; and she had no neurological deficits.  (Tr. 835).  On March 1, 2013, when Plaintiff presented to the hospital complaining of "right flank pain radiat[ing] into [the] right side of [her] abdomen," pursuant to a physical examination, it was reported that she had normal ROM in her neck and in her musculoskeletal system.  No abnormalities were noted in regard to her cardiovascular, neurological, and pulmonary systems.  (Tr. 731-36).  On March 2, 2013, Plaintiff was negative for back pain and seizures, and she was positive for headaches.  (Tr. 764).  Also, on this date Plaintiff hand normal ROM in her neck and musculoskeletal system.  (Tr. 767).  On March 12, 2013, Plaintiff's musculoskeletal and neurological systems were negative; she was negative for headaches; and a diabetic foot examination revealed no polyneuropathy.  (Tr. 599).

On April 18, 2013, pursuant to examination, no respiratory or cardiac abnormalities were reported, and Plaintiff had normal ROM in all extremities.  (Tr. 580).  On May 20, 2013, Plaintiff complained of fatigue, headaches, stiff joints, neck and back pain, and muscle weakness, and denied gait problems, dizziness, muscle weakness, and difficulty saying words. (Tr. 793).  Plaintiff's doctor reported that she was healthy appearing, active and in no distress; that she had "normal 5/5 strength" in her extremities and mild joint tenderness, with no deformity or swelling; that she had normal gait; that her sensory examination was normal; and that Plaintiff had no abnormalities upon examination of her heart, abdomen, skin, throat, head, ears, and lungs.  (Tr. 609, 794).  On May 28, 2013, Plaintiff's doctor reported that her extremities were normal, with no cyanosis or edema; that Plaintiff moved all extremities equally; that Plaintiff had normal strength and tone; that she had full ROM; and that she had no joint tenderness, deformity, or swelling.  (Tr. 629).  On June 24, 2013, Plaintiff stated she had neck pain.  Upon examination, her neck was supple, with full ROM.  Also, Plaintiff had intact ROM,

with no abnormalities, in her musculoskeletal system, and no clubbing cyanosis, or edema in her extremities. (Tr. 853). On July 9, 2013, when Plaintiff was seen for iron deficiency anemia, on examination, she had no cardiovascular or pulmonary irregularities; her abdomen was soft and non-tender; no irregularities were noted in her extremities; and she had no neurological deficits. (Tr. 835). Also, on this date, Plaintiff had normal muscle strength and tone abnormality; she had no difficulty when standing from a sitting position without assistance from her arms; and her gait was normal. (Tr. 829).

Third, the ALJ considered the objective medical evidence relevant to Plaintiff's alleged mental limitations, and concluded that it did not support Plaintiff's allegations regarding the extent of her symptoms and functional limitations. (Tr. 31) See 20 CFR § 404.1529(c)(2); Gonzales, 465 F.3d at 895. In particular, the ALJ considered that, although Plaintiff exhibited a depressed or anxious affect, on occasion, she also repeatedly demonstrated normal mood, affect, and behavior, and adequate insight and judgment. In this regard, on December 23, 2010, Plaintiff was cooperative, and had appropriate mood and affect. (Tr. 415). On June 10 and October 22, 2010, and April 8, 2011, Plaintiff was alert and oriented, and had normal mood and affect. (Tr. 385-86, 427, 474). On September 29, 2011, no psychiatric abnormalities were noted for Plaintiff. (Tr. 290). On October 4, 2011, Plaintiff was alert and oriented, and she had normal mood, affect, speech, behavior, judgment, cognition, memory, and thought content. (Tr. 353). On October 13, 2011, Plaintiff had a depressed affect, was anxious and fearful, exhibited compulsive behavior, had poor insight, attention span, and concentration, and had obsessive thoughts. (Tr. 689).

A January 31, 2012 psychosocial assessment conducted by Michael Cundiff, Ph.D., states that Plaintiff was driven, hopeful, detail-oriented, determined, and caring. It was also reported

that she was well-groomed, cooperative, and agitated; that she had normal speech; that her mood and affect were appropriate; that she had obsessions; that she was fully oriented; and that her judgment and insight were fair. (Tr. 562). On February 27, 2012, Plaintiff was positive for anxiety and had a depressed affect. (Tr. 677-79). On March 2, 2012, upon examination, Plaintiff was oriented and had normal insight, mood, affect and behavior; she had poor attention span and concentration; and she did not have suicidal ideation. (Tr. 675, 767). On June 11, 2012, upon examination, Plaintiff was oriented and in no distress, and had normal mood and affect. (Tr. 818). On November 27, 2012, Plaintiff was oriented with normal insight. (Tr. 651).

On January 18, 2013, Plaintiff was alert, followed commands, was oriented, and had normal insight. (Tr. 641). On March 1, 2013, when Plaintiff presented for abdominal pain, it was noted that Plaintiff was oriented to person, place, and time; she was alert; her speech, behavior, judgment, thought content, cognition, and memory were normal; and her mood appeared anxious. (Tr. 736). It was also reported that there were negative findings in regard to "psychiatric/behavioral" abnormalities. (Tr. 352). On March 2, 2013, Plaintiff was positive for "disturbed wake/sleep cycle." On physical examination, it was reported that she was alert and oriented, and had normal mood, affect, and behavior. (Tr. 764, 767). On March 12, 2013, Plaintiff's "Psychiatric/Behavioral" system was negative, and she was alert and oriented. (Tr. 599).

On May 20, 2013, Plaintiff reported having anxiety, behavior problems, "bipolar, depression and irritability." (Tr. 793). Plaintiff's doctor reported that she was alert and oriented; that she had appropriate affect and quality, quantity, and organization of sentences; that she had normal thought content; that her insight and judgment were age appropriate; that she was alert and cooperative; and that her affect was anxious and restless. (Tr. 609, 794). On May 28, 2013,

it was reported that Plaintiff self-reported that her depressed mood occurred most of the day and nearly every day, and that Plaintiff also self-reported "diminished interest or pleasure in all, or almost all, activities on most days." (Tr. 631). Plaintiff's doctor reported on this date that Plaintiff's orientation was normal; that she was alert and oriented; that she had appropriate affect; that her behavior was restless; and that her insight and judgment were age appropriate. (Tr. 629). On June 24, 2013, Plaintiff's affect and mood were appropriate, and she was alert and oriented with no focal deficits. (Tr. 853). On July 9, 2013, Plaintiff's affect and mood were normal, and she was alert, oriented, and cooperative. (Tr. 829, 835).

Fourth, the ALJ considered Plaintiff's description of her daily activities. In this regard, Plaintiff testified that, on a good day, she would take a shower and help around the house, and that, if she was able, she would go to the grocery store with her daughter. (Tr. 54). Plaintiff also stated, in a Function Report – Adult, that she supervised her eleven-year old daughter when she got ready for school; that she took care of her dogs by giving them food and water; that she showered every other day; that she did not need special reminders to take care of her personal grooming or to take her medicine; that she shopped for necessities, clothes, and gifts in stores, on the telephone, and by mail; and that she could pay bills, handle a savings account, count change, and use a checkbook. (Tr. 201-210). Also, Plaintiff reported reading the Bible. (Tr. 589).

While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, a claimant's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. See Wright v. Colvin, 789 F.3d 847, 854 (8th Cir. 2015) ("Wright himself admits to engaging in daily activities that this court has previously found inconsistent with disabling pain, such as driving, shopping, bathing, and cooking."); McDade v. Astrue, 720

F.3d 994, 998 (8th Cir. 2013) (ALJ properly discounted plaintiff's credibility where, among other factors, plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, tak[ing] care of his dogs, us[ing] a computer, driv[ing] with a neck brace, and shop[ping] for groceries with the use of an electric cart"); Buckner v. Astrue, 646 F.3d 549, 555 (8th Cir. 2011) (finding plaintiff's depression was not severe where plaintiff engaged in daily activities that were inconsistent with his allegations). See also Ponders v. Colvin, 770 F.3d 1190 (8th Cir. 2014) (holding that substantial evidence supported the ALJ's denial of disability benefits in part because claimant "performs light housework, washes dishes, cooks for her family, does laundry, can handle money and pays bills, shops for groceries and clothing, watches television, drives a vehicle, leaves her house alone, regularly attends church, and visits her family"); Roberson v. Astrue, 481 F.3d, 1020, 1025 (8th Cir. 2007) (holding that the ALJ's denial of benefits was supported based in part because Plaintiff fixed meals, did housework, shopped for groceries, and visited friends). Moreover, to the extent Plaintiff urges the court to reweigh the evidence regarding Plaintiff's daily activities and draw its own conclusion (Doc. 12 at 17), it is not the function of the court to do so. See Bates v. Chater, 54 F.3d 529, 531-32 (8th Cir. 1995) ("As we have stated many times, we do not reweigh the evidence presented to the ALJ, and it is the statutory duty of the ALJ, in the first instance, to assess the credibility of the claimant and other witnesses.") (internal citations, punctuation, and quotations omitted). In any case, to the extent Plaintiff argues that her ability to engage in certain daily activities does not establish she is able to work, (Doc. 12 at 17), Plaintiff's daily activities were only one of many factors considered by the ALJ when determining Plaintiff's credibility.

Fifth, the court notes contradictions between Plaintiff's testimony and assertions regarding the severity of her limitations and her medical records, including what she actually told

physicians. (Tr. 32). <u>Karlix v. Barnhart</u>, 457 F.3d 742, 748 (8th Cir. 2006) (contradictions between a claimants sworn testimony and what she actually told her doctors weighs against the claimant's credibility). In particular, Plaintiff denied myalgia, stiff joints, neck and back pain, and muscle weakness on May 20 and 28, 2013. Also, on May 28, 2013, Plaintiff denied feelings of depression, and denied "a sleeping disorder and other associated symptoms, including weight loss and night sweats." Records from this date also indicate that there was "[n]o evidence of grand mal seizure by hx." (Tr. 608, 628, 630). Despite Plaintiff's assertions of an inability to lift, bend, and reach (Tr. 210), on April 18, 2013, when Plaintiff presented with pain to the back of her head, she told health care providers that "two wooden doll chairs" hit her head "when she was moving furniture out of a moving van." (Tr. 579). Also, on this date, Plaintiff told medical providers that she did not have nausea, vomiting, abdominal pain, myalgia, muscle weakness, or joint or back pain. (Tr. 580). As considered by the ALJ, although Plaintiff asserted that she had difficulty feeding and bathing herself, and using the toilet independently and that she was bedridden for several days a week, the record does not reflect that she ever reported these problems to health care providers. Although Plaintiff reported that she used a wheelchair, the record does not reflect that she was ever observed using one, or another assistive device, and, as discussed above, it was frequently reported that she had normal gait. (Tr. 32, 56, 205-12).

Sixth, the court notes that, on January 18, 2013, it was reported that Plaintiff's diabetes was stable, and that her hyperlipidemia could be controlled with medication. (Tr. 639). When Plaintiff presented to her doctor, on May 28, 2013, due to a grand-mal seizure the previous night, she said that she had the seizure "due to mold exposure," and that after she took Benadryl it was better. (Tr. 628). Also, on March 12, 2013, it was noted that Plaintiff's blood pressure was "well controlled," and that, with medication, Plaintiff's abdominal pain improved from a "10" to

a "4." (Tr. 600). On May 28, 2013, Plaintiff denied side effects from her medication. (Tr. 631). As considered by the ALJ, Plaintiff reported significant symptom improvement with an epidural steroid injection to the cervical spine. (Tr. 31). Indeed, on May 18, July 20, and October 11, 2012, Plaintiff "reported 100% relief of [her] pain secondary to the local anesthetic." (Tr. 712, 719, 726). In June 2012, it was reported that Plaintiff said she had pain relief, "mostly from a steroid shot in her back," and that it was the first time she had "been pain free in nine years except when taking Vi[c]odin." (Tr. 588). See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (conditions which can be controlled by treatment are not disabling); Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling).

Seventh, as considered by the ALJ, Plaintiff's treatment was generally conservative, and she did not pursue pain management after October 2012. (Tr. 31-33). Conservative treatment and no surgery are consistent with discrediting a claimant's allegation of disabling pain. Kamann v. Colvin, 721 F.3d 945, 950-51 (8th Cir. 2012) (noting that the ALJ properly considered that the claimant was seen "relatively infrequently for his impairments despite his allegations of disabling symptoms"); Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007) (noting that the claimant sought treatment "far less frequently than one would expect based on the [symptoms] that [he] alleged"); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). In this regard, on January 18, 2013, Plaintiff's doctor recommended that to control her diabetes and hyperlipidemia that she follow a proper diet, stay physically active, and lose weight. (Tr. 639). On March 12, 2013, Plaintiff's doctor recommended that, to control her diabetes, she continue with her medication, follow a proper diet, exercise, stay physically active, and try to lose weight. (Tr. 600). On May

28, 2013, Plaintiff was told to stay physically active. (Tr. 630-31). Further, Plaintiff did not pursue pain management treatment after October 2012. (Tr. 33, 723-29). Additionally, although Plaintiff reported that she was having neck surgery (Tr. 586), as considered by the ALJ, the record does not demonstrate that a specific surgery was ever scheduled or recommended (Tr. 31). Also, as considered by the ALJ, Plaintiff did not seek treatment with an orthopedist, neurologist, or rheumatologist (Tr. 32), and she saw an endocrinologist infrequently for her Cushing's disease. (Tr. 32, 370-74, 383-89, 455-63, 815-19, 825-32).

In regard to Plaintiff's alleged disabling mental health conditions, the ALJ considered that she did not seek treatment with a psychiatrist despite her receiving a psychiatry referral (Tr. 29, 32, 429), and that her mental health treatment included only counseling for four months in 2012 and two sessions in 2013 (Tr. 32, 558-63, 585-96).[1] Although Plaintiff had two psychiatric hospitalizations in June 2013, they were caused by life stressors and medication misuse, and, on discharge, she was doing better. (Tr. 32, 53, 852-61). See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations); Shipley v. Astrue, 2010 WL 1687077, at *12 (E.D. Mo. April 26, 2010) (situational depression is not disabling). Further, the ALJ considered that even if Plaintiff did not have the financial resources to have regular mental health treatment, she was receiving Medicaid benefits during her alleged period of disability. (Tr. 32).

---

[1] The record does reflect that Plaintiff had mental health counseling for six months in 2012. There is no indication, however, that this error in decision writing affected the outcome of Plaintiff's case. See Welch v. Colvin, 765 F.3d 926, 929 (8th Cir. 2014) (ALJ's failure to explicitly address applicable SSR 96-9p was an arguable deficiency in opinion writing that had no practical effect on decision); Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("There is no indication that the ALJ would have decided differently had he read the hand-written notation to say 'walk' rather than 'work' and any error by the ALJ was therefore harmless.").

Eighth, Plaintiff's doctors frequently advised her to cease smoking but she continued to do so. (Tr. 32, 385, 630, 639, 649, 653, 687). Notably, on January 18, 2013, when her doctor recommended that she stop smoking, Plaintiff said that she was not interested in stopping. (Tr. 639). It was also reported, in January 2013, that Plaintiff's compliance with dietary and exercise recommendations was fair. (Tr. 639).

Ninth, as previously addressed, the ALJ considered that Plaintiff's reports of mental problems "occurred in the context of numerous life stressors." (Tr. 33, 558-58). See Dunahoo, 241 F.3d at 1039-40; Shipley, 2010 WL 1687077, at *12.

Tenth, in regard to Plaintiff's allegations regarding the severity of her pseudoseizures, the ALJ considered inconsistencies in Plaintiff's medical records. Specifically, the ALJ noted that, although Plaintiff claimed she was aware of what was happening and could not respond or interact, in December 2010, when Plaintiff reported that she was having a pseudoseizure, Plaintiff's doctor reported that during the one-minute episodes of "drop attacks" while in the hospital, Plaintiff had "normal VS, no movements, no incontinence and had no respiratory problems or cyanosis." "During one episode the nurse placed the IV which prompted [Plaintiff] to pull her arm away." Also, when the doctor entered the room to examine Plaintiff while she was having a pseudoseizure, Plaintiff had her legs crossed. When the doctor asked Plaintiff to uncross her legs, "she did so and had normal strength of left leg but when asked to lift the right leg she was unable to do so." When the doctor asked Plaintiff how she could cross and uncross her legs but not lift her left leg, Plaintiff "then closed her eyes and stopped responding again." (Tr. 27, 413).

As also considered by the ALJ, when Plaintiff presented complaining of a pseudoseizure in June 2011, the doctor noted that that the doctor was "unable to get a reliable exam on

[Plaintiff] based on her uncooperativeness.  [Plaintiff] [would] alternatively answer questions clearly without any slurred speech and look directly in [the doctor's] eyes, and then just close her eyes and not respond to requests."  The doctor also reported that Plaintiff showed voluntary motor control, "but then let[] her hands fall into her lap, gently controlled," when the doctor pulled up Plaintiff's right hand.  The doctor noted that Plaintiff "fairly quickly, within 30 minutes seemed to have recovered from her weakness, [] left the wheelchair and the room and walked to the front of the building to go to the bathroom."  (Tr. 380).

Eleventh, to the extent Plaintiff argues that the ALJ gave insufficient consideration to a Function Report – Adult – Third Party, completed by Plaintiff's daughter, Melanie Camden (Doc. 12 at 20-21), the ALJ noted that Ms. Camden's assertions were nearly identical to Plaintiff's.  The ALJ discounted Ms. Camden's assertions regarding the severity of Plaintiff's limitations for the same reasons that he found Plaintiff's assertions not credible.  (Tr. 33, 220-27).  An ALJ may discount corroborating testimony from third parties on the same basis used to discredit a claimant's testimony.  See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 2006).  Cf. Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that an ALJ's decision need not be reversed where he failed to consider testimony which would not have had an effect on the outcome of the case).  Also, upon discounting Ms. Camden's assertions, the ALJ properly considered that, because Ms. Camden lived with Plaintiff, she would likely benefit from Plaintiff's receipt of disability benefits.  (Tr. 33).  See Choate v. Barnhart, 457 F.3d, 865, 872 (8th Cir. 2006).

The court finds, to the extent Plaintiff argues to the contrary, that the ALJ's determination that Plaintiff was not fully credible is based on substantial evidence and is consistent with the Regulations and case law.

**B.      Plaintiff's RFC:**

Plaintiff contends that the ALJ did not properly determine her RFC.  (Doc. 12 at 7-20).

The ALJ found that Plaintiff could perform medium work, as she could stand, walk, and sit for 4

hours continuously and 8 hours total in an 8-hour workday.  (Tr. 22).  See 20 C.F.R. §

416.967(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent

lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we

determine that he or she can also do sedentary and light work.");  SSR 83-10, 1983 WL 31251, at

*6 (Dec. 12, 1983) (the full range of light work requires standing or walking, off and on, for a

total of approximately 6 hours of an 8-hour workday).  Additionally, the ALJ found that Plaintiff

could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; she could not

climb ladders or scaffolds; she could not tolerate any exposure to unprotected heights, she could

tolerate frequent exposure to moving mechanical parts and extreme cold; she could frequently

operate a motor vehicle; and she was limited to understanding, remembering, and carrying out

simple, repetitive tasks in a low-stress environment, defined as one requiring only occasional

workplace changes and only occasional decision-making.

The Regulations define RFC as "what [the claimant] can do" despite his or her "physical

or mental limitations."  20 C.F.R. § 404.1545(a).  "When determining whether a claimant can

engage in substantial employment, an ALJ must consider the combination of the claimant's

mental and physical impairments."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  "The ALJ

must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including

the medical records, observations of treating physicians and others, and an individual's own

description of his limitations.'"  Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting

McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013).

To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Anderson v. Shalala, 51 F.3d. 777, 779 (8th Cir. 1995). Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified, in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

First, to the extent Plaintiff suggests that her RFC was a medical question and that it should have been determined or confirmed by a medical source (Doc. 12 at 8), Plaintiff is mistaken. As stated above, it is the ALJ's role to evaluate the record in its entirety, including medical opinions and testimony, and formulate a claimant's RFC based on all the relevant, credible evidence of record. See Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012).

Consistent with the Regulations and case law, upon making his RFC assessment, the ALJ identified Plaintiff's functional limitations and restrictions, and then assessed her work-related

abilities on a function-by-function basis.  See Masterson, 363 F.3d at 737; Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004).  In doing so, the ALJ considered Plaintiff's allegations regarding the severity of her impairments and found that they were not fully credible.  Notably, on reaching this conclusion, as discussed above in regard to Plaintiff's credibility, the ALJ methodically and meticulously considered Plaintiff's lengthy and extensive medical records.  As set forth above, despite Plaintiff's allegations that she used a wheelchair and had difficulty lifting, standing, using her arms, walking, talking, hearing, and using her hands, her medical records routinely demonstrated that Plaintiff had normal strength, ROM, and gait, and she was advised to increase her exercise.  As discussed above in regard to Plaintiff's credibility, the ALJ considered medical records relevant to Plaintiff's allegation that she suffered disabling pseudoseizures, including neurological studies which did not show epileptic activity (Tr. 539-40, 546-47), Plaintiff's denial of pseudoseizures in June 2012 and January 2013 (Tr. 27, 816, 826), and inconsistencies in Plaintiff's responses upon examination after experiencing a pseudoseizure.

To the extent Plaintiff argues that the ALJ failed to include symptoms related to her anxiety, PTSD, and seizures in the RFC which the ALJ assigned to her (Doc. 12 at 11-12), the ALJ was only required to include Plaintiff's credible limitations in her RFC.  See Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006) ("The ALJ included all of Tindell's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record.").  Indeed, the court has found that the ALJ's determination that Plaintiff was not fully credible is based on substantial evidence.

The ALJ's RFC determination is consistent with the opinion of Marsha Toll, Ph.D., a State agency psychological consultant.  After reviewing the record, Dr. Toll concluded that Plaintiff was able to perform unskilled work, although she had moderate limitations in sustaining

concentration and persistence. (Tr. 564-77). The ALJ gave significant weight to Dr. Toll's opinion because it was "based upon a thorough review of the available medical evidence, and [was] consistent with and supported by the overall medical evidence of record." (Tr. 30). Indeed, as a State agency medical consultant, Dr. Toll is a highly qualified expert in Social Security disability evaluations. 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (State agency medical consultants are highly qualified experts in Social Security disability evaluation; therefore, ALJs must consider their findings as opinion evidence); Kamann v. Colvin, 721 F.3d 945, 951 (8th Cir. 2013) (State agency psychologist's opinion supported ALJ's finding that claimant could work despite his mental impairments); Casey v. Astrue, 502 F.3d 687, 694 (8th Cir. 2007) (finding ALJ did not err in considering State agency psychologist's opinion along with the medical evidence as a whole). Cf. Thongleuth v. Astrue, 2011 WL 1303374, at *12 (D. Kan. Apr. 4, 2011) (unpublished) (holding that the opinion of a single decision maker (SDM) became a "medical opinion" within the meaning of the Act when it was confirmed by a reviewing medical consultant).

Also, the ALJ considered the opinion of Dr. Winkler, an impartial medical expert. The ALJ gave significant weight to Dr. Winkler's opinion that, as of October 14, 2013, Plaintiff could frequently lift and carry up to 20 pounds and occasionally carry up to 50 pounds; that Plaintiff could sit for 4 hours at a time, for 8 hours total in an 8-hour workday; that Plaintiff could stand for 4 hours at a time, for eight hours total in an eight-hour workday; that Plaintiff could walk for 4 hours at a time, for 8 hours total in an eight-hour workday; that Plaintiff had no manipulative limitations; that she could continuously use her bilateral lower extremities for operation of foot controls; that she could frequently balance, stoop, kneel, crouch, and crawl; that Plaintiff was limited to frequent exposure to extreme cold, moving mechanical parts, and

operation of a motor vehicle; and that Plaintiff could not tolerate any exposure to unprotected heights. (Tr. 885-90).

Upon determining that significant weight should be given to Dr. Winkler's opinion regarding Plaintiff's ability to perform work-related activities as of October 2013, the ALJ considered that Dr. Winkler is a rheumatologist, and, therefore, had "specialized knowledge and experience upon which to draw in evaluating the limiting effects of [Plaintiff's] fibromyalgia." (Tr. 23). See Brown v. Astrue, 611 F.3d 941, 953 (8th Cir. 2010); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than the opinion of a source who is not a specialist."). See also 20 C.F.R. §§ 404.1527(d)(5), and 416.927(d)(5).

The ALJ also considered that Dr. Winkler's opinion regarding Plaintiff's functional limitations as of October 2013 was "particularly probative" as it was based on a "thorough and longitudinal perspective" of Plaintiff's impairments and limitations during the alleged period of disability, see Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010) ("[W]hen evaluating a nonexamining source's opinion, the ALJ 'evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources.'") (quoting 20 C.F.R. § 404.1527(d)(3)), and that no treating or examining physician has rendered opinion evidence regarding the severity and limiting effects of Plaintiff's impairments. (Tr. 23-24).

The ALJ also gave less weight to Dr. Winkler's opinion that as of May 1, 2013, Plaintiff was limited to lifting and carrying 10 pounds frequently and 20 pounds occasionally, although her other limitations were the same as they were as of October 2013, except that from April 1, 2009, Plaintiff was limited to frequent, rather than being able to continuously, reach handle,

finger, feel, and push/pull. (Tr. 887). Upon giving less weight to this aspect of Dr. Winkler's opinion, the ALJ reasoned that the medical evidence did not support Dr. Winkler's conclusions. In particular, the ALJ noted that the medical record contained "very little objective medical evidence showing a significant change in [Plaintiff's] conditions on or around May 1, 2003. (Tr. 24).

To the extent Plaintiff argues that the ALJ drew upon his own inferences upon his rejecting part of Dr. Winkler's opinion (Doc. 12 at 9), the court notes that it was the ALJ's role to review the record as a whole and determine how much weight should be given to medical opinions. See 20 C.F.R. § 416.927(c) ("[W]e will evaluate every medical opinion we receive."). Significantly, Dr. Winkler was not a treating physician, but rather was a non-examining consulting physician whose opinion was not entitled to particular deference. Notably, upon imposing greater limitations on Plaintiff as of May 2013, Dr. Winkler did not specify the basis for her opinion, see 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion), and she indicated these limitations by making checkmarks on a form, see Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004) (checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence).

Most significantly, even if the ALJ had included the more restrictive lifting, crawling, and reaching limitations which Dr. Winkler imposed on Plaintiff as of May 2013, two of the three jobs which the ALJ ultimately found Plaintiff could perform were consistent with these more restrictive limitations.[2] (Tr. 261). Evidence that Plaintiff could perform one job is all that

---

[2] The VE opined that Plaintiff could work as a document preparer which is sedentary work requiring the exertion of up to 10 pounds frequently, Dictionary of Occupational Titles (DOT) § 249.587-018, and a laundry folder which is light work requiring the exertion of up to 20 pounds occasionally, DOT § 369.687-018.

was required to support the ALJ's finding that Plaintiff was not disabled, as long as that job existed in significant numbers in the national economy. See Hakes v. Astrue, 383 Fed. Appx. 581, 583, 2010 WL 2674420, *1 (8th Cir. July 7, 2010) (unpublished) (citing Tommasetti v. Astrue, 533 F.3d 1035, 1043-44 (9th Cir. 2008)). Indeed, the VE noted that there were 95,000 laundry folder jobs nationally, and 119,000 document preparer jobs nationally which Plaintiff could perform. (Tr. 261). These figures greatly exceed the number required for a job to exist in significant numbers. See, e.g., Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988) (holding that 500 jobs was a significant number of jobs); Lee v. Sullivan, 988 F.2d 789 (7th Cir. 1993) (holding that 1,400 jobs was a significant number); Trimiar v. Sullivan, 966 F.2d 1326, 1330 (10th Cir. 1992) (holding that 650 to 900 jobs was a significant number).

To the extent Plaintiff argues that the ALJ improperly went to "great lengths in stating that there was no medical opinion evidence from the treating physicians" to establish that Plaintiff was disabled (Doc. 12 at 9), it is Plaintiff's burden to prove she was disabled. See Pearsall, 274 F.3d at 1217 ("It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."); Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994) (holding that "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision" and that it is the claimant's burden to prove disability and provide credible evidence regarding his alleged impairment); Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013); 20 C.F.R. §§ 404.1512(e), 416.912(e).

Finally, to the extent Plaintiff suggests that the ALJ's RFC determination is not based on substantial evidence merely because a contrary conclusion can be drawn from the evidence, the

standard of review is whether substantial evidence supports the ALJ's findings, not whether

substantial evidence supports contrary findings.  See England v. Astrue, 490 F.3d 1017, 1019

(8th Cir. 2007) ("If substantial evidence supports the decision, we will not reverse, even if

substantial evidence could have been marshaled in support of a different outcome.") (citation

omitted).  In conclusion, the court finds that the ALJ gave proper weight to the medical opinions

of record; that the ALJ's RFC determination is based on substantial evidence and is consistent

with the Regulations and case law; and that Plaintiff's arguments to the contrary are without

merit.

**C.      Hypothetical Posed to the Vocational Expert:**

The ALJ posed a hypothetical to a VE which described a person of Plaintiff's age, and

with her education, work experience, and RFC.  (Tr. 260).  The VE responded that Plaintiff

could perform her past relevant work.  See 20 C.F.R. § 404.1560(b) (if claimant can perform past

relevant work, he or she is not disabled).  Alternatively, as stated above, the ALJ responded that

there were other jobs that Plaintiff could perform, including kitchen helper, of which there were

300,000 jobs available in the national economy, laundry folder, of which there were 95,000 jobs

available in the national economy, and document preparer, of which there were 119,000 jobs

available in the national economy, and that there were no conflicts between these findings and

the Dictionary of Occupational Titles (DOT).  (Tr. 260-61).  See 20 C.F.R. § 404.1560(c)(1)-(2)

(if claimant cannot perform past relevant work, Commissioner is responsible for providing

evidence that demonstrates that there is other work the claimant can perform).

Plaintiff contends that the ALJ posed an improper hypothetical to the VE, and that the

hypothetical should have included limitations beyond those described in the RFC which the ALJ

assigned to Plaintiff.  (Doc. 12 at 20-21).

An ALJ posing a hypothetical to a VE, however, is only required to include a claimant's credible limitations. See Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012); Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded."); Guilliams v. Barnhart, 393 F.3d 789, 804 (8th Cir. 2005) (holding that a proper hypothetical sets forth impairments supported by substantial evidence and accepted as true by the ALJ). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a VE's testimony constitutes substantial evidence supporting the ALJ's decision. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("Based on our previous conclusion . . . that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). When the hypothetical which the ALJ poses to a VE captures the concrete

consequences of the claimant's deficiencies, an ALJ's reliance on the VE's testimony is proper. Gieseke v. Colvin, 770 F.3d 1186, 1189 (8th Cir. 2014).

The court has found that the ALJ's RFC determination is based on substantial evidence. As such, the court further finds that the hypothetical which the ALJ submitted to the VE was proper, see Renstrom, 680 F.3d at 1067; and that the ALJ properly relied on the VE's testimony that there were jobs existing in significant numbers which Plaintiff could perform, see Gieseke, 770 F.3d at 1189; Martise, 641 F.3d at 927; and that Plaintiff's arguments to the contrary are without merit. Because there were other jobs which Plaintiff could perform, the court additionally finds that the ALJ's determination that Plaintiff was not disabled is based on substantial evidence and is consistent with the Regulations and case law.

**IV.**
**CONCLUSION**

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED with prejudice**.

A separate judgment shall be entered incorporating this Memorandum and Order.

Dated this 30th day of September, 2016.

   /s/ Noelle C. Collins           
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE